**2015 UT App 107**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF A.C. AND I.C.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

P.C.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20140236-CA
Filed April 30, 2015

Fourth District Juvenile Court, Provo Department
The Honorable Brent H. Bartholomew
No. 1060284

Neil D. Skousen, Attorney for Appellant

Sean D. Reyes and John M. Peterson, Attorneys
for Appellee

Martha Pierce, Guardian ad Litem

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN and KATE A. TOOMEY
concurred.

VOROS, Judge:

¶1     The juvenile court terminated the parental rights of a
father to two children on the ground that the father had sexually
abused his children's half sister. The father, a Peruvian national,
lived in the United States for eight years before a series of
criminal convictions culminated in his deportation. The father
was represented at trial, but the juvenile court denied a motion

to appoint a Spanish-speaking attorney. The juvenile court also denied a motion to continue. We affirm.

BACKGROUND

¶2    The juvenile court proceeding originally involved five children. P.C. (Father) fathered two of the five children, A.C. and I.C., and acted as a stepfather to the other three children. By the time of the trial in this case, the juvenile court had already terminated the parental rights of the children's mother.

¶3    A.C., I.C., and their mother are American citizens; Father is a citizen of Peru. Father lived in the United States for eight years and worked at a fast food restaurant for at least part of that time. Father testified that while living in the United States he was convicted of disorderly conduct, driving under the influence, driving on a suspended license, and giving false information to a police officer. In addition, Father admitted that he completed a court-ordered domestic-violence treatment program. Father's legal difficulties culminated in his deportation on September 9, 2011. Father cannot re-enter the United States for at least five years from the date of his deportation.

¶4    Two years after Father's deportation, the Division of Child and Family Services (DCFS) filed a verified petition to terminate the parental rights of the five children's mother and their respective fathers, including Father. From Peru, Father filed a financial affidavit seeking appointment of counsel. The juvenile court appointed Father's current counsel (Counsel).

¶5    Four months later, and eleven days before Father's trial, Counsel moved (1) to substitute a Spanish-speaking attorney; (2) to bifurcate and continue the trial; and (3) to allow Father to participate in the trial telephonically. In support of the motions, Counsel alleged that the language barrier between himself and Father amounted to a complete communication breakdown that infringed Father's right to effective assistance of counsel.

¶6 Four days later, the juvenile court held a hearing on Counsel's motions. For reasons unclear from the record, Father did not participate in the hearing (telephonically or otherwise), and the hearing proceeded without him. Counsel stated that he had difficulty communicating with Father because Father did not understand English. Counsel explained that he had tried to communicate with Father through Father's sisters but without much success, as "one sister does not speak English" and the other speaks only limited English. Counsel also expressed concern that having Father's sister interpret for him risked waiving the attorney–client privilege because both sisters appeared on the State's witness list. The State responded that Counsel's communication difficulties stemmed more from Father's uncooperativeness than from the language barrier. The Guardian ad Litem, concerned about the motion's timeliness, responded, "This trial has been scheduled since November 23rd . . . and the motion could have been raised at any time after [Counsel's] appointment, but it's raised right now [eleven] days before trial."

¶7 The juvenile court made no express findings concerning Counsel's communication difficulties but did suggest that Counsel "may have an unwilling client." Nevertheless, the juvenile court explained its intention to continue the hearing until "Tuesday [when] we can try to get a hold of [Father] and we'll have somebody that can speak the language. And if we can't get a hold of him or if he doesn't avail himself of—of making himself available, then I think we need to go ahead with the trial."

¶8 At the continued hearing, with the aid of an interpreter, the juvenile court called Father's home phone in Peru. Whoever answered the phone stated that Father's work schedule made him unavailable until after 6:00 p.m. Peru time, or 4:00 p.m. Utah time. Counsel told the interpreter to inform Father "that we need [Father] available 8:30 this Friday for a trial. 10:30 their time. And that's this Friday." Counsel further told the interpreter to "tell him that if [Father is] interested in participating in the trial, he needs to be available."

¶9    The juvenile court then had a brief discussion with Counsel concerning Father's English proficiency and whether Father had notice of the hearing:

> The Court: [Counsel,] . . . last Friday, we . . . gave you an opportunity through one of our clerks to— to talk with your client.
>
> [Counsel]: Right.
>
> The Court: And in talking with my clerk, he indicated to me that your client understood English.
>
> [Counsel]: He didn't speak to my client, he— apparently one of the family members . . . told the clerk that my client speaks English.
>
> The Court: And so—
>
> [Counsel]: But he doesn't—but I saw in one of the e-mails, Your Honor, that was sent to [the State] before I came on to the case that apparently he doesn't read English but he speaks English. And so I—there's some confusion as to—to what extent he understands and speaks English.
>
> The Court: But was he aware of this—this hearing or this—this conference this morning[?]
>
> [Counsel]: At least through his family member, not personally.

The juvenile court judge, in accordance with his earlier pronouncement, concluded, "Regarding the trial, it sounds like . . . we have a participant that may be unwilling to participate in his—his trial. I can't see that I can do anything but start with the trial." The juvenile court informed Counsel that it could not provide Counsel with an out-of-court interpreter and

suggested that Counsel look into whether the public defender's office could provide one.

¶10    Trial proceeded as scheduled. Father apparently received Counsel's message notifying him of the trial date and time because he appeared telephonically at the beginning of trial. Before starting the trial, the juvenile court allowed Counsel to speak to Father privately with the help of the court interpreter. During their private pre-trial consultation, the interpreter read the general and specific allegations of the amended petition to Father and Father indicated he understood "what was read to him." Counsel later informed the juvenile court that Father understood the proceeding and that Counsel had "gone over [Father's] right to go to trial or to voluntarily relinquish his parental rights" and that Father "elected to go to trial."

¶11    At trial, the State's termination case consisted largely of testimony that Father had sexually abused the half sister of A.C. and I.C. During the trial, but before Father was sworn, Counsel advised Father—through the interpreter—to "not give testimony about any allegations regarding physical abuse or sexual abuse." Father did not testify about the sexual abuse allegations, nor did anyone question him about those allegations. After the parties' opening statements, Father testified on his own behalf. Specifically, Father testified that since his deportation he spoke to his children by phone, that the children would speak to him in English, and that he "would kind of talk to them back in [his] broken English." He testified that he had lived in the United States for eight years before his deportation and during that time learned "[a] little bit of English . . . with [his wife] and . . . at work." He testified that he spoke "a little bit of English" with his wife at home but that they mostly spoke Spanish. Father also testified about the support he provided his children, and the relationship he had with them both before and after his deportation.

¶12    The juvenile court found by clear and convincing evidence that Father had sexually abused the children's half sister and entered findings and conclusions. Based on its factual

findings, which Father does not challenge on appeal, the court terminated Father's parental rights.

ISSUES ON APPEAL

¶13 Father asserts two claims of error on appeal. First, Father contends that the juvenile court erred when it denied his motion to substitute bilingual counsel.[1] Second, Father contends that the juvenile court erred when it denied his motion to continue trial. As a subsidiary argument to the second issue, Father argues that the juvenile court denied the motion to continue on an impermissible basis. Specifically, Father asserts that the juvenile court erred when it based its denial of a continuance on the eighteen-month time-limit for terminating parental rights set forth in Utah Code section 78A-6-314(13)(c).[2]

---

1. Wrapped into this claim is an alternative claim that Father was entitled to an appointed out-of-court interpreter. However, the standard governing the right to an out-of-court interpreter is different from the standard governing the right to substitution of counsel, as these rights derive from different sources. *Compare* Utah R. Jud. Admin. 3-306 (providing language access in the courts), *with* Utah Code Ann. § 78A-6-1111 (providing the right to counsel for indigent defendants in parental termination proceedings). Father did not separately or adequately brief the standard governing the right to an out-of-court interpreter. Accordingly, we decline to address that contention. *See Hess v. Canberra Dev. Co.*, 2011 UT 22, ¶ 25, 254 P.3d 161; *State v. Worwood*, 2007 UT 47, ¶ 19, 164 P.3d 397; Utah R. App. P. 24(a)(9).

2. This section states, "A decision on a petition for termination of parental rights shall be made within 18 months from the day on which the minor is removed from the minor's home." Utah Code Ann. § 78A-6-314(13)(c) (LexisNexis 2012).

ANALYSIS

I. The Motion to Substitute Counsel

¶14    Father contends that the juvenile court erred when it denied his motion to appoint bilingual counsel. Father advances two arguments in support of this contention: (1) that the juvenile court violated his constitutional rights to due process and equal protection and (2) that the juvenile court deprived him of the right to effective assistance of counsel under Utah Code section 78A-6-1111. Utah Code Ann. § 78A-6-1111 (LexisNexis 2012).[3]

A.    Due Process and Equal Protection

¶15    Father relies nominally on the Due Process and the Equal Protection Clauses of the United States Constitution. Our supreme court has "repeatedly warned that [the appellate courts] will not address arguments that are not adequately briefed, and that [we] are not a depository in which the appealing party may dump the burden of argument and research." *Hess v. Canberra Dev. Co.*, 2011 UT 22, ¶ 25, 254 P.3d 161 (citations and internal quotation marks omitted). "To satisfy our adequate briefing requirement, a party's brief must contain meaningful legal analysis. Specifically, [a] brief must go beyond providing conclusory statements and fully identify, analyze, and cite its legal arguments." *Id.* (alteration in original) (citations and

---

3. The State contends that Father did not preserve his due process and equal protection issue for appeal. "[T]o preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *Pratt v. Nelson*, 2007 UT 41, ¶ 15, 164 P.3d 366. But Counsel raised the constitutional issue in a written motion in the juvenile court, the State and Guardian ad Litem both filed written oppositions to the motion, and the juvenile court denied the motion. We therefore conclude that Father preserved this issue for appeal.

internal quotation marks omitted); *see also* Utah R. App. P. 24(a)(9).

¶16     Father's due process and equal protection argument does not satisfy these briefing requirements. Father's briefing of this argument consists of conclusory statements supported by citations to the Due Process and Equal Protection Clauses of the Constitution with no application of controlling precedent to the facts of this case. Accordingly, Father has not carried his burden of persuasion on appeal with respect to his constitutional claims.

B.      Effective Assistance under Section 78A-6-1111

¶17     Father also contends that the controlling statute required the juvenile court to appoint bilingual counsel. Father asserts that under Utah Code section 78A-6-1111, "When the court determines the parent is indigent during a parental rights termination proceeding, the parent has a statutory right to receive court-appointed counsel." He then argues that this statute gives "[p]arents who have court-appointed counsel in child welfare cases in Utah . . . a statutory . . . right to the effective assistance of counsel."

¶18     Utah law provides for the appointment of counsel for indigent respondents in parental termination cases. Utah Code Ann. § 78A-6-1111 (LexisNexis 2012); *see also In re C.C.*, 2002 UT App 149, ¶ 8, 48 P.3d 244. This court has "left no doubt that indigent parents facing the permanent deprivation of their parental rights are entitled not only to an appointed attorney, but to the *effective* assistance of counsel." *Id.* ¶ 7. "[C]onstruing the statute any other way would render it meaningless or illusory." *Id.* ¶ 9 (citations and internal quotation marks omitted).[4]

---

4. The court in *In re C.C.* construed Utah Code section 78-3a-913. 2002 UT App 149, ¶¶ 8–9, 48 P.3d 244. Section 78-3a-913 was renumbered in 2008 as Utah Code section 78A-6-1111. *See* 2008 Utah Laws Ch. 3 (H.B. 78).

¶19    In *In re C.C.*, this court explained that substitution of counsel is part and parcel of the right to effective assistance of counsel and thus courts must inquire into whether circumstances require substitution of counsel:

> An integral part of the right to the effective assistance of counsel is the opportunity to have substitute counsel appointed when necessary, and to that end, to have the court explore a party's complaints regarding the assistance his or her attorney has provided to determine if substitute counsel is indeed necessary.

*Id.* Accordingly, when we review the denial of a motion to substitute counsel, we first "determine whether the juvenile court . . . satis[fied] its duty to inquire." *Id.* ¶ 11. Then, if the court's inquiry sufficed, or if the indigent party "does not dispute that the juvenile court made the required inquiry . . . but argues that her motion was erroneously denied[,] [w]e review the juvenile court's denial of [the] request for new counsel for an abuse of discretion." *In re J.F.*, 2013 UT App 288, ¶ 11, 317 P.3d 964 (citing *In re C.C.*, 2002 UT App 149, ¶¶ 6, 10, 12).

¶20    Father does not challenge the sufficiency of the juvenile court's inquiry. Therefore, we assume without deciding that the juvenile court made a sufficient inquiry into Father's request for substitute counsel. *See id.* We next consider whether the juvenile court abused its discretion when it denied Father's request for substitute counsel. *See id.*

¶21    "The juvenile court has the discretion to appoint substitute counsel if the court's inquiry into the party's request reveals good cause for the substitution." *Id.* ¶ 12. "[T]o warrant substitution of counsel, [an indigent parent] must show good cause, such as . . . a complete breakdown in communication . . . ." *Id.* (first alteration in original) (citation and internal quotation marks omitted). "Although the right to effective assistance of counsel in parental termination cases is grounded in statute, unlike the Constitutional guarantee of a criminal defendant's right to effective counsel, our jurisprudence

relies on criminal law for guidance on the question of substitution of counsel in juvenile proceedings." *Id.* ¶ 12 n.5; *see also In re E.H.*, 880 P.2d 11, 13 (Utah Ct. App. 1994) (adopting the test established in *Strickland v. Washington*, 466 U.S. 668 (1984), to determine the effectiveness of counsel under the statute).

¶22    Father argues that an important element of the right to effective assistance of counsel "is maintaining the ability to actually communicate regarding one's case with one's court-appointed attorney." He maintains that "a presumption [of ineffectiveness] applies when the breakdown in communication is severe enough to prevent [trial] preparation or adequate representation." And indeed courts have held that "a breakdown in communication between an attorney and his or her client can be severe enough to prevent even the most able counsel from providing effective assistance." *United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir. 1988). Further, "[c]ounsel's inability to communicate with his client because of a language barrier may render his assistance constitutionally ineffective." *Gallo-Vasquez v. United States*, 402 F.3d 793, 799 (7th Cir. 2005) (citing *Granada v. United States*, 51 F.3d 82, 85 (7th Cir. 1995) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984))). At oral argument both the State and the Guardian ad Litem acknowledged that a substantial language barrier may deprive an indigent party of the statutory right to effective assistance of counsel. We agree.

¶23    However, in *State v. Pursifell*, we explained that the communication breakdown between an attorney and client must be "complete," and "so substantial as to rise to a . . . level requiring appointment of new counsel." 746 P.2d 270, 274 (Utah Ct. App. 1987); *see also In re J.F.*, 2013 UT App 288, ¶ 12 ("[T]o warrant substitution of counsel, a defendant must show good cause, such as . . . a complete breakdown in communication." (citation and internal quotation marks omitted)). Thus, the issue before us is not whether a substantial language barrier resulting in a complete breakdown of communication requires substitution of counsel—it does. The issue rather is whether the

language barrier in this case resulted in such a breakdown of communication.

¶24    Father fails to point to facts on the record demonstrating that the language barrier in this case qualified as substantial enough to prevent Counsel from providing effective assistance. Counsel did, in the juvenile court and in briefs on appeal, assert that "Father is from Lima[,] Peru and doesn't understand and speak English." But Counsel's assertions, unsupported by specific facts, do not establish that the language barrier rose to the required level. Further, Counsel stated that "there's some confusion as to—to what extent [Father] understands and speaks English." Where Counsel acknowledges confusion exists on the issue of Father's English-speaking abilities, Counsel has an obligation to establish specific facts to clarify the confusion.

¶25    We now consider the facts before the juvenile court here. Father testified, through the in-court interpreter, that he lived in the United States for eight years before his deportation; that he learned some English during that time with the help of his wife and at work; that he spoke "a little bit of English" with his wife at home but that they mostly spoke Spanish; and that when he spoke to his children on the phone, they would speak to him in English and he would respond in English—albeit limited English. These facts clear up some of the confusion surrounding Father's English proficiency and show that while he may not speak English fluently, he has some ability to communicate in English.

¶26    Counsel asserts "it is near impossible to translate legal concepts and terminology without any legal knowledge or background and with only a very limited English vocabulary." However, "a lack of understanding as to legal terminology and the way in which a case proceeds is certainly not unique to non-English speakers." *State v. Jadama*, 2010 UT App 107, ¶ 17, 232 P.3d 545. Accordingly, mere inability to understand legal terminology does not establish a language barrier requiring replacement of counsel.

¶27    The facts on the record also show that Father consulted, privately, with his attorney through an interpreter before the trial began; that Father understood the proceedings as they were explained to him; and that Father testified on his own behalf through the in-court interpreter.

¶28    The record also shows that Father had an opportunity to demonstrate his lack of English ability. While we understand that Counsel may have had difficulty establishing facts relevant to Father's English proficiency when Father did not appear for the hearing on the matter, Counsel did have the opportunity both before the trial began and during his direct examination of Father to establish the necessary facts. In fact, the Guardian ad Litem asked Father during cross-examination how long Father lived in the United States (eight years) and whether he learned any English during that time ("Yes. A little bit of English . . . with [my wife] and also . . . at work."). Thus, the Guardian ad Litem established facts on the record showing Father had some English ability.

¶29    In short, the record contains sparse factual development of the alleged language barrier in this case. Accordingly, we are not persuaded that the language barrier rose to the required level or that Counsel had no opportunity to establish otherwise.

¶30    Further, "[t]he cause of the breakdown . . . in an attorney–client relationship significantly affects whether the breakdown . . . requires the court to substitute . . . court-appointed counsel." *In re J.F.*, 2013 UT App 288, ¶ 12, 317 P.3d 964 (second omission in original) (citation and internal quotation marks omitted). An indigent parent cannot show good cause when the breakdown is due to his own failure to respond to counsel's communications, or is otherwise uncooperative. *See id.* ¶ 13.

¶31    Father asserts that "[i]t is improper to presume" that "[j]ust because [C]ounsel stated he could not communicate with . . . Father and that communication was frustrated," that "Father deliberately chose not to communicate with him." Father further asserts that "the record is silent as to any evidence" that "Father chose not to communicate with [C]ounsel." On the

contrary, the court's conversation with Counsel after Father failed to appear for the continued hearing suggests Father's unwillingness to participate.[5]

¶32 Father did not appear (telephonically or otherwise) for the hearing—a hearing that the juvenile court continued for his benefit—and Counsel indicated that Father had notice of the hearing "[a]t least through his family member." In addition, when the juvenile court decided to continue the hearing it did so with the understanding that "if we can't get a hold of [Father] or if he doesn't avail himself of—of making himself available, then I think we need to go ahead with the trial." Thus, Counsel knew the significance of Father's appearance at the continued hearing.

¶33 Considering the facts on the record as a whole, we cannot agree that the language barrier here prevented Father's understanding of the proceedings, deprived him from participating in his own trial, denied him the ability to proffer a viable defense to the allegations of sexual abuse, or prevented Counsel from preparing for the case. While we recognize Counsel's communication difficulties, we are not persuaded that the facts of record establish that the language barrier rose to the level required "[t]o warrant substitution of counsel." *In re J.F.*, 2013 UT App 288, ¶ 12. Accordingly, we hold that the juvenile court did not abuse its discretion when it denied Father's motion for substitution of bilingual counsel.

## II. The Motion to Continue

¶34 Finally, Father contends that the juvenile court erred when it denied his motion to continue trial. Father asserts that the juvenile court abused its discretion when it denied his motion because denial of the motion prejudiced him.

¶35 "[O]nce a matter has been set for trial, the matter may be continued only with the approval of the court." Utah R. Juv. P.

---

5. *See supra* ¶ 9 for a complete recounting of court and Counsel's conversation.

54(a). "The juvenile court has substantial discretion in deciding whether to grant or deny a request for a continuance, and that discretion will not be disturbed unless that discretion has clearly been abused." *In re V.L.*, 2008 UT App 88, ¶ 15, 182 P.3d 395.

¶36 In *In re V.L.*, the father "argue[d] that the juvenile court abused its discretion in denying his motion for a continuance." 2008 UT App 88, ¶ 25, 182 P.3d 395. Specifically, he argued that because the juvenile court appointed new counsel two weeks before trial, the substitute counsel "did not have adequate time to prepare." *Id.* We explained then that the father "failed to demonstrate with any specificity how the denial of his motion for a continuance prejudiced him at trial." *Id.* ¶ 26. We also pointed out that "the termination proceedings were under way, and the other parties would have been significantly inconvenienced by any further delay" and that one of the other parties objected to the continuance. *Id.* ¶ 27. Therefore, we "conclude[d] that the juvenile court did not abuse its discretion in denying [the] [f]ather's motion for a continuance." *Id.*

¶37 Here, the apparent reason to continue Father's trial was to allow substitute counsel time to come up to speed. But if the father in *In re V.L.* did not establish prejudice due to a lack of preparation when the juvenile court actually appointed new counsel, Father has not shown here how he suffered prejudice when he proceeded with existing counsel. Accordingly, we conclude that the juvenile court did not abuse its discretion when it denied Father's motion.

¶38 In a subsidiary argument, Father asserts that "the juvenile court erred in determining that it could not deviate from" the eighteen-month time-limit for terminating parental rights set forth in Utah Code section 78A-6-314(13)(c), "even upon . . . good cause."

> A decision on a petition for termination of parental rights shall be made within 18 months from the day on which the minor is removed from the minor's home.

Utah Code Ann. § 78A-6-314(13)(c) (LexisNexis 2012). Section 78A-6-314(13)(c) contains no express "good cause" exception to its statutorily established time frame, but Father argues "[a]n exception should have been applied herein given the constitutional issues raised by [C]ounsel." Thus, Father argues his "constitutional Due Process rights trumped the state statute or, at a minimum, provided 'good cause' to extend [the statutory deadline]."

¶39 Father thus argues that section 78A-6-314(13)(c) is unconstitutional as applied. However, Father provides no authority to support his argument, nor does he provide any meaningful legal analysis explaining why the statute as applied in this case is unconstitutional. Given the inadequate briefing on this issue, Father has failed to carry his burden of persuasion on appeal. *See Hess v. Canberra Dev. Co.*, 2011 UT 22, ¶ 25, 254 P.3d 161.

¶40 Father also appears to argue that, even if his rights to due process and effective assistance of counsel did not "trump" the statute's eighteen-month deadline, they at least provided good cause for the juvenile court to disregard the requirements of section 78A-6-314(13)(c). However, as stated, the principal reason for the juvenile court to grant Father's continuance was to allow substitute counsel time to prepare. But here, the juvenile court properly denied Father's request for substitute counsel.

¶41 To the extent that Father argues that Counsel needed time to prepare for trial, we have also already determined that the facts of this case did not prevent Counsel from adequately preparing for trial. In September 2013 the juvenile court appointed Counsel to this case and on November 23, 2013, the court set the case for trial on January 24, 2014. The State served Counsel with the first amended verified petition on December 17, 2013. Eleven days before trial Counsel moved for a continuance. At the hearing on Counsel's motions, Counsel acknowledged the untimeliness of his motion stating, "[A]s the Court knows, we've had an extremely heavy calendar, all of us, in January and previous, and so I haven't had a whole lot of time

to focus on this case other than I'm having difficulty communicating with my client." On these facts, we cannot agree that the juvenile court "clearly" abused its discretion in denying the continuance. *See In re V.L.*, 2008 UT App 88, ¶ 15, 182 P.3d 395.

¶42 Further, if good cause to substitute counsel does not exist where the request stems from the client's own "decision to avoid communicating and cooperating with Counsel," *In re J.F.*, 2013 UT App 288, ¶ 13, 317 P.3d 964, it cannot exist if the client's uncooperativeness played a major role in Counsel's lack of preparation for trial. Where, as here, Counsel did not provide the juvenile court with any assurance that his client would begin to participate in his own defense, we cannot say the juvenile court acted beyond the bounds of reason, or abused its discretion, when it determined Counsel "may have an unwilling client" and thus denied Counsel's motion.

¶43 Accordingly, we affirm the juvenile court's denial of Father's motion to continue.

CONCLUSION

¶44 The judgment of the juvenile court is affirmed.

_____